Rita MOUBRY, on behalf of herself and her minor son, Joe Moubry, Plaintiff,

v.

INDEPENDENT SCHOOL DIST. 696, ELY, MINNESOTA, Defendant.

No. Civ. 5–96–266(RLE).

United States District Court, D. Minnesota.

June 30, 1998.

Sonja D. Kerr, Matthew John Arthurs, Kerr Law Office, Inver Grove Heights, MN, William A. Welp, Welp Law Office, Inver Grove Heights, MN, for Rita Moubry.

Susan E. Torgerson, Charles E. Long, Timothy R. Palmatier, Knutson Flynn Deans & Olsen, St. Paul, MN, for Independent School Dist. No. 696, Ely, Minn.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to

the consent of the parties, made in accordance with the provisions of Title 28 U.S.C. § 636(c), upon the Defendant's Amended Motion for Judgment on the Record, and its Motion for Summary Judgment.

A Hearing on the Motion was conducted on November 13, 1997, at which time, the Plaintiffs appeared by Sonja D. Kerr, Esq., and the Defendant appeared by Susan E. Torgeson, Esq. For reasons which follow, the Defendant's Motions for Judgment on the Record, and for Summary Judgment, are granted.

## II. *Factual and Procedural History*

A. *Procedural Posture.* Pursuant to the Individuals with Disabilities Education Act ("IDEA"), *Title 20 U.S.C. §§ 1400 et seq.,*[1] the Federal Government ensures that students with disabilities receive a "free, appropriate public education" ("FAPE"). *Title 20 U.S.C. § 1400(c).* The IDEA imposes extensive procedural and substantive requirements on participating State and local agencies, in order to safeguard a disabled student's right to FAPE. Among the procedural frameworks created by the IDEA, Section 1415(b)(2) requires an independent Due Process Hearing to be conducted by a State educational agency, so as to ensure that the parents of handicapped children will be afforded an opportunity to register their complaints concerning a public school's evaluation, or educational placement of their child. Pursuant to the IDEA, the State of Minnesota has promulgated Rules which create a procedure for the conduct of such Hearings. See, *Minnesota Statutes Section 120.17, Subdivision 3b(e); Minnesota Rule 3525.4000.*[2] The process is intended to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decision they think inappropriate." *Honig v. Doe,* 484 U.S. 305, 311–12, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

At the pertinent times, the Plaintiff Joe Moubry ("Plaintiff") was a nine year old boy who suffers from verbal apraxia,[3] whose mother, Rita Moubry ("Moubry"), has commenced a discrimination claim in her own right, and on his behalf. The Plaintiff, and his mother, are not unfamiliar with the IDEA process. This is the second lawsuit which has followed State administrative proceedings concerning the Plaintiff's education. See generally, *Moubry v. Independent Sch. Dist. No. 696 (Ely),* 951 F.Supp. 867 (D.Minn.1996) ("Moubry I"); *Moubry v. Independent Sch. Dist. No. 696 (Ely) ("Moubry II"),* Civ. No. 5–95–186(RLE), slip op.

---

**1.** Prior to its amendment in 1990, see, *Pub.L. No. 101–476, § 901(a)(1),* 104 Stat. 1103, 1142 (1990), the IDEA was known as the Education of All Handicapped Children Act ("EHA" or "EAH-CA"). For consistency and convenience, this Opinion refers to the statute, as interpreted both before and after the 1990 amendment, as the "IDEA."

Also, in June of 1997, Congress again amended the IDEA. See, *IDEA Amendments of 1997,* Pub.L. No. 105–17 § 201, 111 Stat. 156. Since the events relevant to this litigation occurred prior to the Amendments' effective date, we consider the Motion for Judgment on the Record under the pre–1997 IDEA. See, *E.S. v. Independent Sch. Dist., No. 196,* 135 F.3d 566, 567 n. 2 (8th Cir.1998).

**2.** The Minnesota Legislature has designated the administrative review process to be initiated as follows:

Parents, guardians, and the district shall have an opportunity to obtain an impartial due process hearing initiated and conducted by and in the school district responsible for assuring that an appropriate program is provided in accordance with state board rules, if the parent or guardian continues to object to:

(1) a proposed formal educational assessment or proposed denial of a formal educational assessment of their child ***.

*Minnesota Statutes Section 120.17, Subdivision 3b(e).*

Once both parties have had an opportunity to submit written objections and responses concerning the District's decision affecting the disabled child, a due process Hearing "shall take place before an impartial hearing officer mutually agreed to by the school board and the parent or guardian" and, "[w]ithin four business days of the receipt of the request for the hearing, if the parties have not agreed on the hearing officer, the school board shall request the commissioner to appoint a hearing officer." *Id.; Minnesota Rule 3525.4000.*

**3.** Apraxia is defined, generally, as a loss of ability to carry out familiar, purposeful movements in the absence of paralysis or other motor or sensory impairment. *Dorland's Illustrated Medical Dictionary,* p. 110 (28th Ed.1994). In other words, it is marked by an inability to execute purposeful learned motor acts, despite the physical ability and willingness to do so. *The Merck Manual,* p. 1395 (16th Ed.1992).

(D.Minn., May 13, 1997) (Order granting Defendant's Motion for Judgment on the Record).

At the first level of the administrative process, upon which this action is predicated, a Hearing Officer ("HO"), who was appointed by the Minnesota Commissioner of Education, heard three days of testimony, and ruled that the School District had provided the Plaintiff with FAPE, as required by the IDEA, but directed the District to provide a paraprofessional, as needed, to assist in providing educational support for the Plaintiff. The Plaintiff appealed this determination to a Hearing Review Officer ("HRO"), who was also appointed by the State Commissioner of Education. The HRO conducted an administrative review, considered additional evidence, and affirmed the HO's decision in its entirety.

On September 4, 1996, the Plaintiff filed this action, which seeks to overturn the HRO's decision, and which also alleges that the Defendant violated Section 504 of the Rehabilitation Act, *Title 29 U.S.C. § 794;* discriminated against him on the basis of his learning disability under the Americans with Disabilities Act, *Title 42 U.S.C. §§ 12101–12213* ("ADA"), and the Minnesota Human Rights Act ("MHRA"), *Minnesota Statutes Section 363.01–14;* failed to adhere to the Minnesota Education Laws, *Minnesota Statutes Section 120.17, Subdivisions 3a(1) and (3), and Section 120.185;* and failed to promptly respond to a request for information, in violation of the Minnesota Government Data Practices Act ("MGDPA"), *Minnesota Statutes Sections 13.01 et seq.* As a prelude to our discussion of the merits of these claims, we summarize the operative facts.

### B. *Factual Background.*

The Plaintiff was first diagnosed with verbal apraxia in July of 1992, when he was three years old, and after his mother became concerned that his speech was not developing normally. Among other symptoms, apraxia adversely impacts upon the Plaintiff's speech communication abilities. As a consequence, on September 22, 1992, the Plaintiff was referred to the School District for an early childhood development assessment. Based upon this assessment, as well as treatment notes from the University of Minnesota Clinic, an Individual Education Plan ("IEP")[4] was developed for the Plaintiff, with the participation of Moubry, who was accompanied by her legal advocate, Linda Bonney, and a variety of School District representatives.

As provided in the first IEP, which Moubry signed on November 18, 1992, the Plaintiff received 75 minutes speech therapy, 35 minutes of occupational therapy, and 270 minutes of early childhood special education, on a weekly basis. *Moubry II,* supra at 3. This IEP has been reviewed, and modified, on several occasions in an effort to tailor it to the Plaintiff's needs.

Since the first IEP, Moubry has frequently contested, on her son's behalf, the Defendant's efforts to facilitate an education appropriate to the Plaintiff's needs, and those confrontations have been detailed in this Court's prior Orders. In the midst of this contentiousness, the Plaintiff left Ely to live with his aunt, in Madison, Wisconsin, and he commenced the 1995–96 school year in attendance at the Madison public schools. See, *Moubry II,* supra at 17.

In January of 1996, the Plaintiff returned to Ely and, on January 5, 1996, having learned of the Plaintiff's return, the District's

---

**4.** As we have explained elsewhere:

An IEP "sets out the child's parent educational performance, establishes annual and short term objectives for improvement in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Evans v. District No. 17 of Douglas County, Nebraska,* 841 F.2d 824, 827 n. 1 (8th Cir.1988). The IEP "must be reviewed, and, where necessary, revised at least once a year in order to ensure that local agencies tailor the statutorily required free appropriate public education to

each child's unique needs." *Learning Disabilities Association v. Board of Education of Baltimore County,* 837 F.Supp. 717, 720 (D.Md. 1993), quoting *Barnett v. Fairfax County School Bd.,* 927 F.2d 146, 150 (4th Cir.1991). In short the IEP is the "modus operandi" of the IDEA. *School Comm. of Town of Burlington, Mass. v. Dept. of Ed. of Cmwlth. of Mass.,* 471 U.S. 359, 368, 105 S.Ct. 1996, 2001–02, 85 L.Ed.2d 385 (1985). *Moubry v. Indep. Sch. Dist. No. 696(Ely),* 951 F.Supp. 867, 877 n. 4 (D.Minn.1996).

Special Education Director, Francis Spencer ("Spencer"), sent Moubry a brief letter which stated that he would like to assist in arranging programs, and services, for the Plaintiff, but that he had been unable, thus far, to contact her by telephone. He requested that Moubry telephone him in order to make those arrangements. *Letter from Spencer to Moubry of 1/5/96, Certified Inventory Document Number (hereinafter "CI")* 10. On January 16, 1996, Moubry contacted the School District, by hand delivering a note to its Superintendent, Terrence K. Merfeld ("Merfeld"), which advised that she would like to re-enroll the Plaintiff in the Public Elementary School in Ely, and requested the earliest starting date, as well as a description of the educational program that would be provided for her son. *Note from Moubry to Merfeld of 1/16/96, CI* 196. The Plaintiff's counsel also wrote a similar letter, asking what services would be provided to the Plaintiff, if he were to enroll in the District. *Letter from Kerr to Long, CI* 125.

The Principal of Washington Elementary, Robert Jalonen ("Jalonen"), informed Moubry, on January 22, 1996, that the Plaintiff could start school as soon as Moubry signed the required enrollment forms. *Letter from Jalonen to Moubry of 1/22/96, CI* 198. In response to Moubry's request for information concerning the services that would be provided to the Plaintiff, Jalonen explained that the School District planned to "follow usual procedure which [wa]s to request his former school to forward his school records, including his IEP to [the School District]" and, "[u]pon receipt of the records [the School District] w[ould] schedule a staffing, at [Moubry's] convenience, to review the IEP and its implementation." *Letter from Jalonen to Moubry, CI* 198. Moubry refused to enroll her son in school unless she knew, in advance, what program the Plaintiff would enter, and she kept her son out of school for another week. Meanwhile, the School District personnel obtained the Plaintiff's most recent IEP, which had been developed by the Madison School District on January 23, 1995. By letter dated January 30, 1996, Spencer informed Moubry that services—premised

upon the Madison IEP—would be implemented unless she elected to have a new IEP implemented. *Letter from Spencer to Moubry of 1/30/95, CI* 199. The Madison IEP provided for the supplementation of the Plaintiff's regular education program with an orthopedic impairment program, speech and language training, and physical therapy and occupational therapy, but it did not prescribe academic assistance, or transportation, as related services. *Level II Findings of Fact* [5] ¶ 3; *Madison IEP of 1/23/95, CI* 222.

During the Plaintiff's first week of school, Cheryl Beymer ("Beymer"), who was the first grade teacher, inventoried his academic skills, and concluded that he lagged significantly behind the other first graders, and appeared to be on a par with his classmates' abilities as they existed at the beginning of the school year. *Level I Hearing Transcript ("Tr.")* at 453–54, 460, *CI* 273. Beymer discussed this problem with Jalonen, who also served as Washington Elementary's director for Title One services, which is a regularly provided educational program. *Tr.* at 552, *CI* 273. The two decided that Title One services should be provided to the Plaintiff, if Moubry agreed, because: 1) the madison IEP, which was already in place, would not have to be altered by the addition of Title One services; and 2) Title One services were generally used first to determine whether these services, as a less burdensome alternative, could remedy the problem. *Tr.* at 505–06, 627.

On February 5, 1996, Moubry agreed to the provision of Title One reading services, *Level II Findings of Fact* ¶ 11, but, in a note below her signature, Moubry advised that she wanted "measurable objectives" to be included in the IEP. *Personalized Education Plan ("PEP") of 2/5/96, CI* 110. No school official informed Moubry of the difference between Title One services and special education services. *Tr.* at 500, 1019, *CI* 273, 276. Thereafter, on February 8, 1996, the School held an IEP meeting, in order to draft an IEP that would include the provision of Title One reading assistance. *Tr.* at 93, *CI* 271.

---

**5.** What is termed the *"Level I Findings of Fact,"* and the *"Level II Findings of Fact,"* are the factual findings of the Hearing Officer ("HO"), and of the Hearing Review Officer ("HRO"), respectively.

Although duly notified, Moubry failed to attend this meeting. *Level II Findings of Fact* ¶ 12–13, *Tr.* at 85–86. The IEP meeting produced an IEP that listed reading as a related service—to be fully accomplished by the provision of the Title One program. *Ely IEP of 2/8/96, CI* 113. According to the IEP team, the Plaintiff had not demonstrated a special education need in any academic area, but reading services were listed as an additional accommodation to the Plaintiff's regular first grade education. *Id.*

The Plaintiff, however, contends that the IEP team either knew, or should have known, that he needed special education in reading. In its possession, the IEP team had the Plaintiff's prior IEP from the Madison School District, which noted that his written language ability lagged behind that of other students. According to the IEP that was prepared one year earlier, by the Madison Metropolitan School District, "[the Plaintiff] perform[ed] at grade level except for written language in which he require[ed] adaptations/modifications for fine motor delays;" "[h]is visual motor skills [we]re <4 years 2 months;" "[the Plaintiff] c[ould] write (print) his name," "[but] *** ha[d] difficulty with letter formation;" and "[h]e c[ould] print 11 upper case letters without a model and 5 with a model." *Ely IEP of 1/23/95, CI* 222. The Madison IEP specified, as annual goal for the Plaintiff, that he develop his writing skills "to a mid-kindergarten level." *Id.*

The District also had a progress report, from the 1995–96 school year, that was completed by the Plaintiff's teachers in Madison, *Report Card, CI* 224, which rated the Plaintiff's educational progress as "satisfactory" in most areas, with a few "very good" marks. The only exception was in the language arts category labeled "reads independently," in which the Plaintiff's progress was considered to be "inconsistent." His teachers commented as follows:

> Joey has made wonderful progress *all* semester, both socially and academically. Joey needs to continue working on reading, readiness skills & inventive spelling skills.

*Id.* [emphasis in original].

As noted, the district drafted an IEP that provided reading instruction as a related service, and provided that service through Title

One services. *Level II Findings of Fact* ¶ 14; *Ely IEP of 2/8/96, CI* at 113. The Title One program implemented the Milestones reading program, which is a sight-based program that was later switched to the phonics-based Companion program. *Level II Findings of Fact* ¶ 16; *Ely IEP of 2/8/96, CI* 113. As required, the District forwarded, to Moubry, a copy of the newly developed IEP. The reading services commenced on February 12, 1996, through the instruction of Rose Gornik ("Gornik"), who was a licensed grade school teacher, and who had taught, as a Title One reading instructor, for the previous fifteen years. *Tr.* at 343–45.

On March 5 and 13, 1996, Moubry expressed concerns about her son's reading education, and requested that a qualified independent reading specialist review the proposed IEP. *Letter from Moubry to Spencer of 3/5/96, CI* 204; *Letter from Moubry to Spencer of 3/13/96, CI* 209. She also expressed concerns that Janet Jacobs ("Jacobs"), who was an expert on apraxia, had been scheduled to conduct such an evaluation, without Moubry's input, and that Jacobs expertise extended, in Moubry's view, only to the areas of speech and language, but not to reading. *Level I Findings of Fact—Reading Issue* ¶ 11; *Letter from Moubry to Spencer of 3/13/96, CI* 209. On March 26, 1996, Jalonen notified Moubry that, after conferring with a reading specialist with the Minnesota Department of Children, Families and Learning—who, in turn, had conferred with Jacobs—it became apparent that the Plaintiff required a reading program that was more phonics-based, and the Companion program was substituted for the Reading Milestones program. *Level I Findings of Fact—Reading Issue* ¶ 16; *Letter from Jalonen to Moubry of 3/26/96, CI* 213.

In an effort to address Moubry's rejection of the IEP of February 9, a Conciliation Conference was held on March 28, 1996. Jacobs, who was invited to the District as a consultative advisor, stated in her report to the Conference that, "[a]lthough language disorders can be present with apraxia, it is generally considered a sensory-motor speech disorder and not a language or linguistic problem." *Jacobs Report of 3/28/96, CI* 228. Jacobs further advised that a combination of

sight words, and a phonics approach to reading, was usually recommended for those children who experienced apraxia, and who also had reading problems. *Id.*

During the Conciliation Conference, the reading program and transportation services were discussed, *Conciliation Conference Agenda*, CI 118, and Moubry requested an Independent Educational Evaluation ("IEE") of the Plaintiff. *Level II Findings of Fact* ¶ 22. At the conclusion of the Conciliation Conference, which had been recorded on cassette, Moubry attempted to take the cassette with her. *Tr.* at 1021–22, CI 276. School officials told her that the tape was school property, and that the police would be called if she continued to proceed with her intention to appropriate the cassette. *Tr.* at 1022, CI 276. Moubry claims that, thereafter, she has been afraid to attend IEP meetings. *Tr.* at 1022–23, CI 276. The final result of the Conciliation Conference was a failure to agree on a reading program, although the School District acceded to Moubry's request that an IEE be conducted. *Level I Findings of Fact—Reading Issue* ¶ 22–23.

On April 4, 1996, the District issued a Conciliation Conference Memorandum, which set forth a proposal to supplement the educational services that were proposed in the IEP. *Conciliation Conference Memorandum*, CI 119. In the area of reading, the District proposed that the "Chapter I teacher will continue to provide 1:1 instruction" to the Plaintiff, which would be based upon the regular classroom instruction. *Id.* The instruction would also serve to assess the Plaintiff in order to determine whether special education services for reading were needed. *Id.* The District also proposed to allow the Plaintiff additional time in which to complete writing assignments. *Id.* Additional reassessments, by the faculty of the University of Minnesota, in Duluth, and at the University of Wisconsin, in Superior, were suggested, as well as additional motor skills therapy. *Id.* As the disputed topic of transportation, the District did not agree that the Plaintiff was qualified for transportation as a related service, but it acceded to having one

of its school buses transport the Plaintiff to and from school day each day. *Id.*

Moubry continued to oppose the February IEP, even with the proposed modifications, and, on April 11, 1996, she requested an IDEA Administrative Hearing. *Letter from Kerr to Long of 4/11/96*, CI 143. On April 23, 1996, the School District moved to dismiss the administrative proceeding, contending that the issues presented by the Plaintiff were either the subject of pending litigation—that is, *Moubry II*—or should have been addressed through the State's complaint process. On May 5, 1996, the HO denied the District's Motion, but narrowed the issues to be heard to the Plaintiff's reading program, and his request for transportation services. *Level I Findings of Fact—Reading Issues* ¶ 25, 27.

Before the Administrative Hearing, the School District agreed to the conduct of an IEE that Moubry had requested. *Level II Findings of Fact* ¶ 26. The School District proposed two evaluators. The Plaintiff, however, requested the resumés of the evaluators, as well as information concerning their previous experience with apractic students, and as to their prior service as expert witnesses in special education proceedings. *Id.* Acceding to these requests delayed the administration of the IEE by several weeks. *Id.*

On May 20, 1996, Cherlynn Brumbaugh ("Brumbaugh") performed the IEE. Prior to the evaluation, Brumbaugh contacted two experts on apraxia, and she observed the Plaintiff in the classroom. *Tr.* at 647–58, CI 274. Although Brumbaugh did not interview Moubry, she provided Moubry with two questionnaires, which Moubry did not complete. *Tr.* at 674–76, CI 274. Brumbaugh also administered the Woodcock Johnson Revised norm reference test, and the Wechsler Individual Achievement Test. *Level II Findings of Fact* ¶ 29.

The Plaintiff's scores in reading fell far below the national average. *Id.* ¶ 30–31. The Plaintiff's scores on the Woodcock–Johnson Revised norm reference test were reported to be:

| Test/SubTest | Standard Score (100 mean) | National Percent (50% mean) | Functioning Level |
|---|---|---|---|
| Broad Reading | 76 | 5% | low |
| Basic Reading Skills | 76 | 6% | low |
| Reading Comprehension | 81 | 11% | low average |
| Broad Math | 81 | 11% | low average |
| Math Reasoning/Applic. | 80 | 10% | low average |
| Broad Written Language | 83 | 13% | low average |
| Basic Skills | 79 | 8% | low |
| Broad Knowledge | 101 | 53% | average |

Assessment Team Summary Report, CI 58.

The results of the Wechsler Individual Achievement Test were similarly poor, as the Plaintiff's scores, as a percentile of the population in basic reading, spelling, and reading comprehension, were 4, 12, and 19 percent, respectively. *Id.*

On the basis of this testing, Brumbaugh concluded that the Plaintiff was in need of more educational support, and she suggested that he be exposed to a variety of reading approaches, as there was no particular approach was recommended for all children with apraxia. *Id.* On May 23, 1996, the IEP Team discussed the results of the IEE, and reached the conclusion that special education services in the area of reading would be appropriate. *Tr.* at 182, CI 271. Once again, notwithstanding due and proper notice of the meeting, Moubry did not attend. *Level II Findings of Fact* ¶ 37; *Notice of Team Meeting of 5/8/98*, CI 122. The School District's 1996–96 academic year came to an end on May 24, 1996. *Level I Findings of Fact— Reading Issue* ¶ 46.

On May 30, 1996, the Level I Hearing commenced. Shortly thereafter, the HO ordered the IEP Team to develop goals and objectives for the Plaintiff's educational reading program. *Level II Findings of Fact* ¶ 38. On June 5, 1996, the IEP Team identified reading goals and objectives. *Id.* ¶ 39. On the following day, Moubry, who had declined to attend the IEP meeting, advised that she disagreed with the proposed goals and objectives of the IEP, but she did not specify the nature of her objections. *Id.* ¶ 40.

On June 18, 1996, the HO issued a decision which concluded that the reading program, which had been provided to the Plaintiff between January 31, 1996 and May 24, 1996, had been appropriate. *Level I Decision* ¶ 1. The HO found that, since the Madison IEP did not identify any academic needs in the area of reading, and in view of the fact that the Plaintiff's most recent report card from Madison had identified no academic areas in which he was "having difficulty," the Title One services represented an appropriate first level of intervention. *Level I Conclusions* ¶ 9. Additionally, the HO determined that the test results of the IEE were valid and reliable. *Level I Conclusions* ¶ 12. As to the transportation issue, it was noted that the School District agreed to begin transporting the Plaintiff, and that transportation was added to the IEP on May 31, 1996, as a related service, but the HO awarded compensatory education to the Plaintiff due to the School District's failure to earlier provide the transportation services—an award that the School District elected not to appeal. *Id.* ¶ 3. The HO refused to award monetary damages. *Id.* ¶ 17.

With respect to the Plaintiff's future reading program, the HO approved the reading goals and objectives, which were offered by the School District's proposed IEP, with the exception that provision should be made for the Plaintiff's participation in a general class-

room reading program, with such paraprofessional assistance as may be needed in order to facilitate that participation. *Level I Decision* ¶ 2. Notably, the HO concluded that he would not require any specific educational methodologies or strategies to be employed by the District, and explained that the "IDEA leaves the substance and the details of a disabled child's educational program to the local school officials." *Id.*, citing *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 (5th Cir.1989).

The Plaintiff timely appealed the HO's decision, and specified the following asserted errors: 1) that the HO erred in determining that the Plaintiff had been provided with a FAPE through the provision of Title One reading services, from January 31, to May 24, 1996; 2) that the HO erred in finding that Moubry had been permitted equal participation in the IEP process; 3) that the HO erred by permitting the School District to submit evidence concerning speech services, when the issue was not properly before the HO; 4) that the HO should have awarded monetary reimbursement for transportation expenses; and 5) that the HO should have ordered the School District to use the Orton–Gillingham method of reading instruction. *Level II Procedural History* ¶ 15. The Hearing Review Officer ("HRO") rejected these claimed errors, and affirmed the HO's decision in its entirety.

The HRO was not persuaded by the Plaintiff's contention that the School District was required to provide special education services to him, immediately upon the discovery that his reading skills were deficient. *Level II Conclusions of Law* ¶ 18. The HRO explained that a student, who receives special education services related to one disability, is entitled to receive services in another area only if the student experiences a need that is related to the original disabling condition. *Id.* Absent this showing, the HRO reasoned, the student must qualify for special educational services in the new area of need. *Id.* The HRO noted that Jacob's Expert Report revealed that there was no direct connection between the Plaintiff's apraxia and his reading difficulties and, therefore, there had been no denial of FAPE attributable to the School District's failure to immediately provide special education services in reading. *Id.* ¶ 19.

As to the Plaintiff's IEE, the HRO rejected the Plaintiff's contention that the assessment was invalid for lack of a parental input, and found that the evaluator had made "reasonable efforts" in attempting to obtain the information from Moubry. *Id.* ¶ 15.

Similarly, the HRO found no merit to the claim that the HO had erred in failing to direct the School District to employ the Orton–Gillingham method in the Plaintiff's instruction program. *Id.* ¶ 22. The HRO concluded that there was no evidence in the Record to support the Plaintiff's position that FAPE could only be satisfied through an instructional program that was based on Orton–Gillingham. *Id.* As the HRO explained, it "is not within the authority of the IHO of [sic] the HRO to dictate the specific educational methods that the District is to implement, absent a clear showing that the proposed method of instruction was so inappropriate as it would deprive Student of receiving any educational benefit." *Id.* [citations omitted]. Lastly, the HRO was not convinced by the Plaintiff's contention that his mother was not permitted an opportunity to participate in the IEP Team process. Although the HRO agreed that the process was tainted by a somewhat adversarial atmosphere, she held that the District did all it reasonably be expected to accomplish, in attempting to engage Moubry's participation. *Id.* ¶ 23.

As noted, on September 4, 1996, the Plaintiff filed this action, which seeks a judicial review of the HRO's determination, and advances other Federal and State statutory claims for monetary damages. In his Complaint, the Plaintiff focuses upon a number of asserted errors that the HRO either committed, or failed to cure. First, he contends that the HRO improperly excluded certain evidence that the Plaintiff had attached to his Reply Brief on appeal, because the HRO characterized the materials as "additional evidence." According to the Plaintiff, in failing to consider these materials, the HRO could not have based her decision upon the "entire record," as is mandated by Minnesota Statutes Section 120.17, Subdivision 3b(g). *Compl.* ¶ 59.

Second, the Plaintiff maintains that the HRO erred in deciding that he was not entitled to special education in reading immediately upon the School District's discovery that his reading level lagged behind that of his classmates. *Id.* ¶¶ 60, 65. Third, the Plaintiff asserts that the HRO committed error in considering the "good faith" of the School District in administering Title One services, when determining whether the Plaintiff had received FAPE. *Id.* ¶ 61. Fourth, he reiterates his belief that the HRO should have ordered the Orton–Gillingham method of instruction. *Id.* ¶ 62. Fifth, the Plaintiff complains that the costs of transportation should have been awarded, in addition to the inclusion, in his IEP, of transportation as a future related service. Sixth, the Plaintiff challenges the HRO's determination that he was not entitled to an additional IEE at the taxpayers' expense. *Id.* ¶ 63. Seventh, the Plaintiff also contests the HRO's determination, that he was not entitled to another IEE, on the related ground that the testimony, from his care givers and former teachers, was in error. *Id.* ¶ 64. Eighth, the Plaintiff claims that the HRO erred in upholding the HO's decision that speech services would not be a part of the hearing process. *Id.* ¶ 68.

On the day that the Complaint was filed, the Plaintiff also sought preliminary injunctive relief, which would award him substantially the relief his Complaint sought, pending a final determination of his claims. We denied the Motion for a Preliminary Injunction. See, *Moubry v. Independent Sch. Dist. No. 696(Ely)*, Civ. No. 5–96–266(RLE), slip op. (D.Minn., Oct. 7, 1996). The School District now moves for a Judgment on the Record, with respect to the IDEA claim, and for Summary Judgment as to the other claims.

### III. *Discussion*

A. *Judgment on the IDEA Record.* The IDEA requires that a disabled child be provided with access to "free appropriate public education." *Title 20 U.S.C. § 1400(c)*; see also, *Board of Educ. v. Rowley*, 458 U.S. 176, 203, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir.1997), cert. denied, — U.S. —, 118 S.Ct. 1840, 140 L.Ed.2d 1090 (1998). The purpose of the IDEA is to facilitate the provision of "a 'basic floor of opportunity' by opening the door of public education to disabled children, with the hope of integrating them in regular classrooms as much as possible." *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1372 (8th Cir.1996), quoting *Board of Educ. v. Rowley*, supra at 192, 102 S.Ct. 3034.

All children with disabilities, including those suffering from apraxia, "who, by reason thereof, need special education and related services" are covered by the IDEA's protections. *Title 20 U.S.C. § 1401(a)(1)(A)*. These protections include "special education" and "related services." "Special education" is "specially designed instruction *** to meet the unique needs of a child with a disability," while "related services" include physical therapy, transportation, and other supportive services, "as may be required to assist a child with a disability to benefit from special education ***" *Title 20 U.S.C. § 1401(a)(16) and (17)*.

FAPE, under the IDEA, is an educational experience which provides a disabled child with special education and related services that are tailored to that child's unique needs, by means of an IEP. *Title 20 U.S.C. § 1401(a)(18)*. The IEP must include the child's present educational level and goals, specific services to be provided, needed transition services, and criteria for progress evaluation. *Title 20 U.S.C. § 1401(a)(20)*. The IDEA also ensures that parents are afforded a meaningful opportunity to participate in the formulation of the IEP, and receive notice of any proposed changes in their children's educational programs. *Title 20 U.S.C. § 1415(b)(1)(C)*.

A parent who disagrees with a proposed IEP, or otherwise believes that her child's education falls short of the Federal standard, is entitled to a State Administrative Hearing. *Title 20 U.S.C. § 1415(b)(2)*; see also, *Fort Zumwalt Sch. Dist. v. Clynes*, supra at 610. Under the IDEA, this administrative process is governed by State law. See, *Independent Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 560 (8th Cir.1996). After exhausting all administrative remedies provided by State law, an aggrieved party may file a civil action in state or federal court. *Title 20 U.S.C. § 1415(e)(2)*.

In reviewing an administrative determination under the IDEA, the Supreme Court has set forth the following two-part inquiry for evaluating challenges to IEP's that have been developed pursuant to the Act:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Board of Educ. of Hendrick Hudson Cent. School Dist. Westchester County v. Rowley,* supra at 206–07, 102 S.Ct. 3034.

■ Since Federal Judges are not trained educators, and Courts do not craft educational policy, judicial review under the IDEA is quite limited. *E.S. v. Independent Sch. Dist., No. 196,* 135 F.3d 566, 569 (8th Cir. 1998).

Here, the Plaintiff challenges the substantive and procedural underpinnings of the District's promulgation of his IEP, in February of 1996, and its revision, in June of that same year. As we have previously noted, the Plaintiff has challenged the HRO's decision in a number of its particulars, and we consider those challenges, in turn.

### 1. The Exhaustion of Administrative Remedies and Claim Preclusion.

The Plaintiff's Complaint is founded, in part, upon the School District's alleged "failures and refusals to ensure that Plaintiff Joe received adequate speech therapy services, including clinical speech services, with meaningful measurement of his progress through phonetic inventories, consistent with the HRO's decision in Civil File 3–95–186 [Moubry I]," which resulted in denying him FAPE. *Compl.* ¶ 72. The HO had refused to hear the Plaintiff's claims, with respect to the speech therapy services, because that issue was the subject of litigation then pending before the District Court. See, *Level I Findings of Fact—Reading Issue* ¶ 25, 27; *Level II Procedural History* ¶ 5–6. Rather than to squarely raise the HO's refusal to the HRO's review, the Plaintiff instead, on Administrative Appeal, challenged subsequent decisions, by the HO, to admit evidence related to the speech therapy services. See, *Level II Procedural History* ¶ 15F. The Plaintiff now resuscitates his original challenge to speech therapy services, and to the HO's refusal to consider that issue, thereby implicating the IDEA's exhaustion requirement, and the related concerns over preservation of issues for appeal.

a. *Standard of Review.* The IDEA incorporates administrative exhaustion, as a prerequisite to judicial review, through the following provision:

> Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

*Title 20 U.S.C. § 1415(e)(2);* see also *Minnesota Statutes Section 120.17.*

■ As we have previously recognized, this provision requires the aggrieved party to exhaust his administrative remedies before seeking relief in Federal Court. See, *Moubry I,* supra at 892; *Peter v. Johnson,* 958 F.Supp. 1383, 1392 (D.Minn.1997).

The exhaustion doctrine embraces the concept that "agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer." *McCarthy v. Madigan,* 503 U.S. 140, 145, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); see also, *Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972) (exhaustion allows agency to correct its own errors and moot juridical controversies); *McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (exhaustion doctrine prevents Courts from undermining the administrative process and permits an agency to employ its expertise). Exhaustion of the administrative process " 'allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by

giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children.' " *Peter v. Johnson,* supra at 1392, citing *Hoeft v. Tucson Unified Sch. Dist.,* 967 F.2d 1298, 1303 (9th Cir.1992); *Board of Educ. of Hendrick Hudson Cent. School Dist. Westchester County v. Rowley,* supra at 207–08, 102 S.Ct. 3034. The propriety of an exhaustion requirement seems particularly telling where, as here, the doctrine minimizes unnecessary judicial intervention, by a Federal Court, into an area of educational policy which is traditionally in the orb of the States. Cf., *United States v. Lopez,* 514 U.S. 549, 580–81, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1994) (education considered to be an area of traditional State regulation, and therefore dissuasive of an exercise of Federal commerce power therein) (Kennedy, J. concurring); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 610, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (principles of comity and Federalism favor exhaustion of State remedies as a prerequisite to Federal judicial intervention).

Accordingly, parties who seek to invoke the judicial expertise, of either a State or Federal Court, must first exhaust all state administrative remedies under the Act, "including administrative appeals provisions, before bringing a federal action to challenge the evaluation and placement of a child." *Jacky W. v. N.Y.C. Bd. of Educ.,* 848 F.Supp. 358, 360 (E.D.N.Y.1994); see also, *Gardner v. School Bd. Caddo Parish,* 958 F.2d 108, 112 (5th Cir.1992) (requiring parents to appeal to State administrative agency, unless appeal would be futile); *D.R. v. Bedford Bd. of Educ.,* 926 F.Supp. 47, 49 (S.D.N.Y.1996) (student who withdrew from administrative process failed to exhaust, because he would have been able to appeal local decision). Understandably, this requirement will yield to a showing, by the Plaintiff, that resort to the administrative process would have been futile or inadequate, would have wasted resources, would have worked severe or irreparable harm on the litigant, or would have raised purely legal questions. See, *Honig v. Doe,* supra at 327, 108 S.Ct. 592. "It is the plaintiffs' burden to demonstrate that their circumstances warrant excusal from the administrative procedures." *Peter v. Johnson,* supra at 1393.

█ The exhaustion doctrine is not the only deterrent to an aggrieved student's bypass of the State administrative process for, related to the exhaustion doctrine, and driven by similar concerns, is the rule of administrative claim preclusion, which holds as follows:

> Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires that as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

*4 Kenneth C. Davis, Administrative Law Treatise § 26:7,* at 441 (2nd Ed.1983) (internal citations omitted).

Applying this "general rule," a number of Courts have refused to consider, under the IDEA, challenges to an HO's decision on an issue, when that challenge was not presented, on appeal, to the appropriate HRO. See, *Moubry I,* supra at 886–87 (failure to preserve issue on administrative appeal constitutes waiver); *Coe v. Michigan Dep't of Educ.,* 693 F.2d 616, 618 (6th Cir.1982); *Bruschini v. Board of Educ. of Arlington Central School Dist.,* 911 F.Supp. 104, 107 (S.D.N.Y.1995); *Drinker v. Colonial Sch. Dist.,* 888 F.Supp. 674, 678–79 (E.D.Pa.1995); *D.R. v. East Brunswick Bd. of Educ.,* 838 F.Supp. 184, 194 (D.N.J.1993); see also, *David D. v. Dartmouth Sch. Committee,* 775 F.2d 411, 424 (1st Cir.1985) ("for issues to be preserved for judicial review they must first be presented to the administrative hearing officer"), cert. denied, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986).

█ Indeed, one Court has considered the failure to preserve a claim on administrative appeal, in the IDEA process, as creating a strict *res judicata* bar to the litigation of that claim in Federal Court. See, *Coe v. Michigan Dep't of Educ.,* supra at 617. According to the *Restatement (Second) of Judgments,* Section 25, Comment e:

> When a plaintiff brings an action on the claim in a court, either state or federal, in which there is no jurisdictional obstacle to his advancing both theories or grounds, but he presents only one of them, and judgment is entered with respect to it, he

may not maintain a second action in which he tenders the other theory or around. Regardless of whether a State administrative IDEA decision carries with it the full force of common law preclusion, under *University of Tennessee v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986),[6] the IDEA prescribes its own rule of preclusion by stating that any decision of the HO "shall be final," except that an aggrieved party may appeal the decision to the HRO. *Title 20 U.S.C. § 1415(e)(1).*[7] At a minimum, the failure to raise, and to preserve, an issue in the administrative process—absent a demonstration that circumstances warrant a relaxation of the exhaustion requirement—renders the unappealed HO's decision "final," and constitutes a waiver of such an issue in a subsequent civil action.

b. *Legal Analysis.* There is a pivotal dispute as to whether the Plaintiff presented, to the HRO, his objection concerning the HO's exclusion of speech related therapy issues. All parties agree that the Plaintiff squarely presented the issue of speech services to the HO, and that the HO excluded that issue from the administrative process because of the pendency of *Moubry II.* According to Minnesota law, if the Plaintiff disagreed with the HO's decision to exclude

the speech services issue, he was required to specifically note the alleged error in his appeal to the HRO. See, *Minnesota Statutes Section 120.17, Subdivision 3b(g).* Minnesota law, however, does not specify what consequences should befall a party who appeals, but who does not particularize, for the HRO, the individual grounds of the appeal.

 As our review of the Record makes clear, the Plaintiff did not appeal the HO's decision, regarding the speech therapy services issue, to the HRO. Instead, he appealed the HO's admission of evidence, which related to that issue, when consideration of the issue had been ruled out of order. *Level II Procedural History* ¶ 15F. The Plaintiff now contends that this ground for an appeal encompassed an objection to the HO's initial decision to exclude the speech issue. However, there is no evidence that the Plaintiff presented an argument, to the HRO, to that effect, or that the HRO understood the Plaintiff was making any such claim of error.[8] As a consequence, the issue resolves to whether the Plaintiff's failure, to specify the focus of his appeal to the HRO, should bar our consideration of the speech services issue.

In our view, the Plaintiff has impermissibly traversed the IDEA's exhaustion require-

6. In *University of Tennessee v. Elliott*, 478 U.S. 788, 797, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) the Supreme Court held that, "when a state agency 'acting in a judicial capacity *** resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's Courts." *Id.* at 799, 106 S.Ct. 3220 [citation omitted]. In interpreting *Elliott*, as applied to State administrative findings under the IDEA, one Court has held that, because the statute provides for *de novo* judicial review over state educational decisions and policies, *Elliott* does not require Federal Courts to give preclusive effect to judicially unreviewed State IDEA proceedings. *JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1569 (11th Cir. 1991). In this Circuit, however, review of State administrative decisions is something less than *de novo*, as "it still requires the reviewing court to give 'due weight' to agency decision-making." *Independent Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 561 (8th Cir.1996). Further, as discussed *infra*, our Circuit considers IDEA proceedings to be entitled to some measure of preclusive effect under *Elliott*. See, *Id.* at 562. We need not enter that debate here, however, for neither the

HRO, nor the HO, made factual findings concerning the issue of speech services, which would potentially invoke *Elliott*'s rule of preclusion.

7. To be precise, the IDEA states that a "decision made in a hearing conducted pursuant to paragraph (2) of subsection (b) shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (c) and paragraph (2) of this subsection." *Title 20 U.S.C. § 1415(e)(1).* Subsection (c) of Section 1415 provides that "any party aggrieved by the findings and decision rendered in [a local] hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing." *Title 20 U.S.C. § 1415(c).* The aggrieved party may then proceed to obtain judicial review of the HRO's determination. *Title 20 U.S.C. § 1415(e)(2).*

8. The HRO couched the Plaintiff's appeal of the speech services issue, in the following terms: "Did IHO err by permitting District to put forth evidence regarding speech services, when this issue had been excluded by IHO from this hearing." *Level II Procedural History (Moubry II)* at ¶ 15F.

ment, by not appealing the HO's exclusionary decision to the HRO. The HRO had no notice and, therefore, no opportunity to responsibly review the HO's decision to circumscribe the issues to considered at the Due Process Hearing, and the HRO was deprived of any occasion to properly weigh the competing interests which were not voiced in the proceedings before her. Simply stated, even if he had been aggrieved by the HO's decision to exclude the speech services issue, the Plaintiff did not follow the procedures set forth in Section 1415(e)(1), and in Minnesota Statutes Section 120.17, Subdivision 3b(g), by appealing that decision to the HRO. Instead, he chose to challenge a subsequent admission of evidence, by the HO, as being inconsistent with the earlier decision to exclude the speech services issue. Exhaustion contemplates finality and, having elected to pursue one avenue of appeal—concerning the inadmissibility of certain speech services evidence—the Plaintiff cannot now complain that he intended to appeal a separate, and distinct issue, to the HRO. Had the Plaintiff adhered to the procedural rules, the HRO would have been allowed to apply her educational expertise, see, *McKart v. United States,* supra at 193–95, 89 S.Ct. 1657, to resolve, if appropriate, an error on the HO's part. See, *Parisi v. Davidson,* supra at 37, 92 S.Ct. 815. In failing to raise the issue before the HRO, the Plaintiff would circumscribe that expertise, and presents this Court with the scantiest of Records upon which to conduct our judicial review. See, *Peter v.*

*Johnson,* supra at 1392. Of course, if the issue had been properly raised, and preserved, the HRO could have taken additional evidence, if the parties would have made such a request, and our review would have been facilitated by the considered views of the HRO, upon a full Record. This responsible approach has been precluded by the Plaintiff's error. Lastly, there is no evidence that the administrative process was somehow inadequate, or that resort to that process would have been an exercise in futility, as the Plaintiff decided, for whatever reason, not to the place that issue in contest on appeal, and our consideration of that matter is now barred.

2. *The IDEA's Procedural Requirements.* The Plaintiff has identified a number of claimed procedural errors, in the formulation and revision of his IEP, which hindered, he believes, Moubry's full participation in the IEP process. We consider each of these asserted deficiencies individually, and in concert, in order to determine whether they rise to a level of substantiality as would render the IEP legally defective.[9]

■ a. *Standard of Review.* The Supreme Court has unmistakably recognized that the adequacy of an IEP is to be judged by whether the procedural requirements of the IDEA have been satisfied. In pertinent part, the Court has stated:

> When the elaborate and highly specific procedural safeguards embodied in § 1415

9. We may summarily reject several perceived procedural irregularities that the Plaintiff suggests should void the State administrative decision. In one claimed error, the HRO characterized, as "additional evidence," material that was appended to the Plaintiff's brief. In reality, this material was already a part of the voluminous Record that had been compiled by the HO. As a result, the Plaintiff now contends that this mischaracterization reveals that the HRO could not have reviewed the entire Record, as required by Minnesota Statutes Section 120.17, Subdivision 3b, or she would have known that the materials were properly in the Record. We reject, as unsound, the contention that the mischaracterization discloses any failure, by the HRO, to fully review the Record on appeal. The mere fact that the HRO considered the attached material to be "additional evidence" merely suggests that she did not possess an encyclopedic memory of each document in a voluminous Record, and not that she did not fully consider the Record before her.

The Plaintiff also contends that the HRO erred in refusing to order an additional IEE, at public expense, which would include information from the Plaintiff's caregivers, and his former teachers and therapists in Madison. The HO and HRO determined that the IEE, which had been conducted, produced "valid results," and that the Independent Evaluator made "reasonable efforts," as required by Minnesota Rule 3525.2750, Subpart 1(F), to obtain information from Moubry. The HRO concluded that Moubry was not entitled to another IEE at public expense. *Level II Conclusions of Law* ¶ 15. As here pertinent, the Federal Regulations provide that, if the first evaluation was "appropriate," then the parent may not obtain another at public expense. *34 C.F.R. § 300.503(b).* Absent any evidence which would undermine the HRO's finding, that the IEE produced valid results, hers refusal to order another IEE, at public expense, is without error, and must be affirmed.

are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, see, e.g., §§ 1415(a)–(d), as it did upon the measurement of the resulting IEP against a substantive standard. *Board of Educ. of Hendrick Hudson Cent. School Dist. Westchester County v. Rowley*, supra at 205–06, 102 S.Ct. 3034.

Congress directs us, therefore, to enforce the IDEA's procedural safeguards "so that parents of a handicapped child will have adequate input in the development of the child's IEP." *Independent Sch. Dist. No. 283 v. S.D.*, supra at 562.

Specifically, the IDEA requires that any participating State educational agency shall provide procedural safeguards, including the following:

(A) an opportunity for the parents or guardian of a child with a disability to *** obtain an independent educational evaluation of the child;

 \* \* \* \* \* \*

(C) written prior notice to the parents or guardian of the child whenever such agency or unit—

(i) proposes to initiate or change, or

(ii) refuses to initiate or change,

the identification, evaluation, or educational placement of the child or the provision of free appropriate public education to the child

*Title 20 U.S.C. § 1415(b)(1).*

Regulations promulgated under the IDEA also require each public agency to "provide to parents, on request, information about where an independent educational evaluation may be obtained." *34 C.F.R. § 300.503(2).*

■ This Circuit has adopted what amounts to a harmless error standard, by which to review claimed procedural deficiencies in the formulation of an IEP, by holding that an "IEP should be set aside only if 'procedural inadequacies compromised the

pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.'" *Independent Sch. Dist. No. 283 v. S.D.*, supra at 562, quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir.1990). As a consequence, a challenge to the validity of an IEP, "based upon a 'laundry listing' which details a 'myriad of technical' deficiencies, may well be insufficient to discredit the appropriateness of the education that was shouldered by that IEP." *Independent Sch. Dist. No. 283 v. S.D.*, 948 F.Supp. 860, 882 (D.Minn.1995), aff'd. 88 F.3d 556 (8th Cir.1996).

b. *Legal Analysis.* By and large, the HO and HRO concurred in finding that the School District had complied with all applicable procedural requirements under the IDEA, and under Minnesota law. The HRO noted, as follows, one possible procedural deviation by the School District:

From the time Student's delays in reading were discovered until District agreed to assess Student approximately two months elapsed. Further delays in obtaining the assessment can be attributed to both parties. During the two month period from identification of the problem until assessment was agreed upon, and in the two month period it took to complete the assessment, Student received remedial services in the form of Title One reading assistance. While District arguably should have made arrangements to assess Student earlier, it cannot be held on this record that a two month delay in agreeing to an assessment while remedial assistance was being offered amounted to a denial of FAPE. Therefore, IHO's findings and conclusions in this area must be affirmed.

*Level II Conclusions of Law ¶ 20.*

Notwithstanding the difficulties spawned by the poor communications between the School District and Moubry, the HRO concluded that Moubry "was afforded an opportunity to participate in the IEP Team process." *Id.* ¶ 23.

In his Complaint, however, the Plaintiff enumerates a variety of perceived procedural inadequacies that, he asserts, were not prop-

erly taken into account during the administrative process, or which plagued the integrity of the process itself. According to the Plaintiff, the School District unreasonably delayed in evaluating him, during the administration of the Title One reading services. He also claims that the Defendants "unilateral" decisions, concerning the provision of his special education services, along with the improper remarks that were directed toward his mother, during the conciliation session, denied Moubry the right to be an equal participant in the IEP process. See, *Compl.* ¶ 72.

■ Without question, there was a breakdown in communication between Moubry and the District, which delayed the Plaintiff's assessment, but we agree with the HRO that, whatever procedural inadequacies may have arguably existed did not constitute a material intrusion into the Plaintiff's right to FAPE, nor did they impair, in any practical sense, Moubry's right to participate in the IEP process. See, *Independent Sch. Dist. No. 283 v. S.D.*, supra at 562. The Record establishes that Moubry was properly notified of every significant step in the IEP formulation process, and was invited to attend and participate in team meetings. Further, the voluminous correspondence between the District, Moubry, and her attorney, demonstrates that every reasonable effort was made to ensure that Moubry's right to participate, in the formulation of the Plaintiff's IEP, would be preserved.

The Plaintiff further asserts that Moubry first raised the issue of an IEE on March 5, 1996, while the District did not address the IEE request until the Conciliation Conference of March 28, 1996, at which it general agreed to the conduct of a reassessment. Nevertheless, the IEE was not performed until the end of May. While the Plaintiff blames the delay on the District, the HRO found that, while blame was to be shared by both Moubry and the District, it did not amount to a denial of FAPE. The Plaintiff urges that, because the District was partially at fault, and since the District did not respond, to Moubry's IEE request, within 10 calendar days, as required by Minnesota Rule 3525.2560, Subpart 1, Moubry was not afforded an equal participation in the IEP process. Assuming, *arguendo*, that the District violated Minnesota procedure, there has been no competent showing that the " 'procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.' " *Independent Sch. Dist. No. 283 v. S.D.*, supra at 562. The Record as a whole convinces us that the delay in securing the IEE was the product of Moubry's participation in, rather than her exclusion from, that process, as much of the delay is attributable to the time expended in responding to the concerns of Plaintiffs' counsel over the qualifications of the proposed evaluators.

Furthermore, Moubry's inability to participate in the formulation of the IEP can largely, and properly, be attributed to her repeated failures to attend IEP Team meetings. Moubry suggests that the altercation, over her attempt to seize the tape recording of the conciliation session, "chilled" her interest in participating further, by making her afraid of going to the school. We are not so persuaded, since several of her absences, from the Team meetings, occurred before the seizure incident. The Plaintiff also contends that, when the teacher and the principal subsequently agreed that Title One services should be provided, and when they informed Moubry of their decision without explaining the difference between the two services, she was denied a meaningful opportunity to participate in the formulation of the IEP. Yet she was duly notified that the IEP meeting would be held on February 8, 1996, and yet failed to attend. Neither the Plaintiff, nor Moubry, can fault the District for her repeated failure, if not refusal, to fully participate in the educational progress of the Plaintiff, when the opportunities were fully available to her. The IDEA fosters the involvement of parents, in the decisions which govern the educational progress of their children, but the Act contains no provision to compel parental participation, to command the edification of the parents on the full gamut of educational law, or to assure that parental participation is wholly pleasurable. Like most of life's experiences, the IEP process is influenced by personalities and influences which, with a commonali-

ty of interest and effort, the participants may channel toward the educational benefit of the disabled student. Here, such a channeling was made particularly difficult by Moubry's personal decision not to actively participate in the joint effort.

In the final analysis, we concur with the HRO that the process of securing an appropriate IEP for the Plaintiff was by no means flawless, but the "laundry list" of proffered procedural inadequacies, on this Record, does not convince us that the IEP was adversely impacted, and that it should otherwise be set aside. See, *Independent Sch. Dist. No. 283 v. S.D.*, supra at 882.

3. *The Substantive Challenge to the IEP.*

■■■■ a. *Standard of Review.* Under the IDEA, a reviewing Court must independently determine, based on "the preponderance of the evidence," whether a School District has complied with the requirements of the Act. Although this is "a less deferential standard of review than the substantial evidence test common to federal administrative law[,] *** it still requires the reviewing court to give 'due weight' to agency decision-making." *Independent Sch. Dist. No. 283 v. S.D.*, supra at 561; see also, *E.S. v. Independent Sch. Dist., No. 196*, supra at 569; *Fort Zumwalt Sch. Dist. v. Clynes*, supra at 610; *Yankton Sch. Dist. v. Schramm*, supra at 1373. Further, when a party has asked the Court to make a determination on the Administrative Record, "[j]udicial review of agency action may be conducted *** even if there are disputed issues of material fact." *Independent Sch. Dist. No. 283 v. S.D.*, supra at 561; see also, *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir.1993) (where the Court makes findings of fact on disputed issues in IDEA proceeding, it is not a "true summary judgment procedure[,]" but a "bench trial based on a stipulated record"), cert. denied, 513 U.S. 825, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994).

■■■■ In conducting this review, a Court may "afford[] greater weight to the fact findings of the HO [as opposed to the HRO] in view of his opportunity to observe the demeanor of the witnesses and to render believability determinations." *Independent Sch. Dist. No. 283 v. S.D.*, supra at 870 (D.Minn.1996); see also, *Fort Zumwalt Sch.*

*Dist. v. Clynes*, supra at 610 ("consideration should be given to the fact that the state hearing panel had the opportunity to observe the demeanor of witnesses"). Nevertheless, where an IEP is being challenged, "*Rowley* instructs that we may not substitute our own 'notions of sound judicial policy for those of the school authorities.'" *Independent Sch. Dist. No. 283 v. S.D.*, supra at 561, quoting *Petersen v. Hastings Public Schools*, 31 F.3d 705, 707 (8th Cir.1994).

■■■■ "Insofar as a State is required to provide a handicapped child with a 'free appropriate public education,'" the Supreme Court maintains that a State satisfies this requirement "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from than instruction." *Board of Educ. v. Rowley*, supra at 203, 102 S.Ct. 3034. In delineating the standard by which to measure the adequacy of benefits provided under the IDEA, the Court settled upon a qualitative standard—namely, that "some benefit" would have to result from the educational process. *Id.* at 200, 102 S.Ct. 3034. In this respect, "[t]he IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents." *Independent Sch. Dist. No. 283 v. S.D.*, supra at 878–79, quoting *Lenn v. Portland Sch. Committee*, 998 F.2d 1083, 1086 (1st Cir.1993). The IDEA does not require schools to "either maximize a student's potential or provide the best possible education at public expense," but only requires a school to "provide sufficient specialized services so that the student benefits from his education." *Fort Zumwalt Sch. Dist. v. Clynes*, supra at 612, citing *Board of Educ. v. Rowley*, supra at 203, 195, 102 S.Ct. 3034.

b. *Legal Analysis.*

i. *The School District's Employment of the Title One Program from February to May of 1996.*

■■■■ The linchpin of the Plaintiff's challenge to the proceedings below rests in the District's employment of Title One services. The HO unequivocally determined, and the HRO concurred, that the Plaintiff received

FAPE through the Title One program, from January 31, 1996, through May of 1996. See, *Level I Decision* ¶ 1; *Level II Decision* ¶ 1. This decision, the Plaintiff contends, contravenes the great weight of evidence which shows that the School District should have known, at a much earlier date, that the Title One services, that it was providing, were of no educational value to him.

The Plaintiff points to his 1995 report card, from the Madison Public Schools, which states that "Joey needs to continue working on his reading-readiness skills and inventive spelling skills." Additionally, when the Plaintiff's teacher first inventoried his reading skills, she discovered that he was significantly behind the other students in his reading capabilities. Yet, according to the Plaintiff, the School District refused to give him the special education that he needed, in the area of reading, choosing, instead, to employ Title One services. This asserted failure to provide FAPE is evidenced, according the Plaintiff's argument, by the results of the IEE, which showed that he, after four months of Title One services, was still reading at an unsuitable level.

Many of the findings of the HO, and of the HRO, hinge upon the report of the apraxia expert who opined that there is no correlation between apraxia, of which the District was aware, and reading difficulties. The HRO concluded that, "[a]bsent any nexus between Student's apraxia and his reading difficulty, there can be no denial of FAPE attributed to District's failure to immediately provide special education services in reading," and, therefore, it "was not inappropriate for District to attempt to remedy Student's need with Title One services in the first instance, absent any academic goals in Student's Madison IEP and absent any connection between verbal apraxia and reading delays." *Level II Conclusions of Law* ¶ 19.

There is little, if any, factual dispute between the Plaintiff, and the HRO and HO, concerning the objectively observable status of his reading ability in January of 1996. The Plaintiff's Madison report card provided some indication that the Plaintiff had struggled with reading, but it did not rank him in the lowest category of "having difficulty," but described his reading ability as "inconsistent." *Report Card, CI* 224. The report card's author, who recommended that the Plaintiff continue to work on his reading skills, did not provide any clear indication that the Plaintiff's reading difficulties were of dominant concern, such as would counsel special educational services. In the same vein, the IEP, which was developed in Madison, did not provide for academic assistance in reading, nor did it provide any suggestion that the Plaintiff's reading ability required special education. *Ely IEP of 1/23/95, CI* 222. Thus, when the Plaintiff's homeroom teacher inventoried his skills upon his return to Ely, and determined that he was not reading at par with his peers, she could not be properly charged with having constructive knowledge that the Plaintiff's apractic condition was causing his reading deficiency.

The Plaintiff particularly challenges the educational policy decision to implement Title One services, as a first means of intervention, which was formally adopted by the School District at the IEP meeting of February 8, 1996, and which was upheld by the HO and HRO as not amounting to a denial of FAPE. Although not special education, Title One is designed to "provid[e] children an enriched and accelerated educational program *** through additional services that increase the amount and quality of instructional time ***." *Title 20 U.S.C. § 6301(d)(2)*. The HRO found that, during the four month period in which Title One services were administered, the Plaintiff received FAPE. We agree.

The Record demonstrates that, during this time period, the Plaintiff made progress in reading. Gornik, who was the teacher providing the reading services, testified that the Plaintiff made progress during this period. *Tr.* at 360, *CI* 272. She explained:

> The Milestones program, he could pick up any of the books and reread a story from it. He knew the words in context better than he did in sight words alone. So he needed the pictures sometimes, but by the end of the 15 weeks, once he had read the story, if I could get him to read it a second time, he read it without mistakes.

*Tr.* at 359, *CI* 272.

The Plaintiff also managed to complete five units in the Companion reader series. *Tr.* at 360, *CI* 272. In fact, the Plaintiff has agreed

that, during the first grade, he had learned to read. *Tr.* 745, *CI* 275. As noted, the independent evaluator considered the Plaintiff's reading ability to be far below the national average but, without a baseline frame of reference, such as a similar evaluation taken before the provision of Title One services, it is impossible to conclude, from the IEE, what impact Title One services had upon the Plaintiff's reading skills. In the end, we only have the testimony of the Plaintiff, and of his instructor, to inform us as to the progress was made, and their testimony is supportive of some measure of progress. The HO weighed that testimony, amongst other factors, and found that the Plaintiff had made acceptable progress in reading. We have no basis, in fact or in law, to reject that finding of fact.

Accordingly, we find that, while Title One services were not a "perfect solution" for the Plaintiff's reading difficulties, they provided him with educational benefit and, therefore, the February IEP did not result in a denial of FAPE. See, *E.S. v. Independent Sch. Dist., No. 196*, supra at 569.[10]

### ii. The HRO's Failure to Order that the Orton–Gillingham Reading Method be Imposed.

In the wake of the Plaintiff's poor showing in the IEE, the School District conceded that special reading education services should be added to his IEP. The IEP Team met, on May 23, 1996, to discuss what program should be administered—a meeting which Moubry failed to attend—and developed an IEP that incorporated a variety of instructional methods, as had been recommended by expert testimony. The HO upheld this plan except that the Plaintiff should be allowed to participate in the general classroom reading program, with para-professional assistance.

The Plaintiff continues to object to this teaching method, and prefers the Orton–Gillingham approach. The HRO found that there was nothing in the Record that demonstrates the Orton–Gillingham technique to be the only instructional approach that would provide the Plaintiff with FAPE, and concluded that it was not within her authority to dictate specific educational methodologies, absent a clear showing that the District's proposed method was so inappropriate as to constitute a denial of FAPE. *Level II Conclusions of Law* ¶ 22

It is well-settled that "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Bd. of Educ. of Hendrick Hudson Cent. School Dist. Westchester County v. Rowley*, supra at 208, 102 S.Ct. 3034. Indeed, the IDEA directs the Courts to resist any impulse to substitute their own notions of educational policy for those of the District. *E.S. v. Independent Sch. Dist., No. 196*, supra at 569, quoting *Bd. of Educ. of Hendrick Hudson Cent. School Dist. Westchester County v. Rowley*, supra at 206, 102 S.Ct. 3034. Here, in the face of expert opinion to the contrary, see, *Jacobs Consultation Report of 3/28/96, CI* 228; *Assessment Team Summary Report of 5/20/96, CI* 123, the Plaintiff urges us to reject the "variety of methods of instruction," that were upheld by the HRO, as not reasonably calculated to provide him with some educational benefit. The Plaintiff's own expert, Patricia Higgins ("Higgins"), prefers the Orton–Gillingham method of instruction, and specifically the Putnik approach to that method. *Tr.* at 916, 936–37, *CI* 276. Nevertheless, Higgins did not testify that the Orton–Gillingham method was the only one that would be effective generally, or for the Plain-

---

**10.** Because we uphold the HRO's decision, that the provision of Title One services did not amount to a denial of FAPE, on the ground that the Plaintiff received educational benefit from the instruction, we need not consider the Plaintiff's claim that the HRO erred in mentioning that the District acted in "good faith" in its implementation of Title One services. While the Plaintiff is correct that "good faith," alone, will not excuse a failure to comply with the requirements of the IDEA, the mere mention of "good faith," without more, is not sufficient grounds for reversal, although it is a proper consideration,

amongst others, in determining whether the IEP was "reasonably calculated" to deliver educational benefit. See, e.g., *Doe By and Through Doe v. Board of Educ. of Tullahoma City Schools*, 9 F.3d 455, 459 (6th Cir.1993) (upholding District's "good faith" IEP), cert. denied, 511 U.S. 1108, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994); *D.B. v. Ocean Tp. Bd. of Educ.*, 985 F.Supp. 457, 497 (D.N.J.1997) (considering District's good faith as a factor in evaluating placement). In any event, the HRO's decision can stand without reference to the District's "good faith."

tiff, in particular. At most, there was a legitimate disagreement among the experts in the field as to what methodology would best help the Plaintiff. This Court is not well-suited to resolve that debate—particularly when we have not observed the demeanor of the testifying experts—and we conclude that the District has carried its burden of showing that the Plaintiff would receive meaningful educational benefit from the IEP that the HRO upheld.

### iii. *The HRO's Failure to Award Transportation Costs in Addition to Compensatory Education.*

As noted, the HO determined that the Plaintiff was entitled to door-to-door transportation, as a related service under his IEP, and he awarded 20 hours of compensatory education in order to remedy any deprivation of education owing to tardiness or absenteeism, due to a lack of transportation, during the period from February 1 through, April 9, 1996. *Level I Decision* ¶ 3. Further, the HO held that he lacked authority to award compensatory damages. *Level I Conclusions* ¶ 17. While the District did not appeal the award of compensatory education, the HRO affirmed the denial compensation for expenses incurred in transporting the Plaintiff, as "[n]o evidence was presented concerning the nature of these expenses or their amount." *Level II Conclusions of Law* ¶ 11. The Plaintiff contends that the HRO erred in refusing to award transportation costs.

 In *Heidemann v. Rother,* 84 F.3d 1021, 1033 (8th Cir.1996), our Court of Appeals held that "damages" are not recoverable under the IDEA. Yet the Supreme Court, in *School Comm. of the Town of Burlington v. Department of Educ.,* 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), held that parents may obtain "reimbursement," under Section 1415(e)(2), "for expenses that [the District] should have paid all along and would have borne in the first instance had it developed a proper IEP." We conclude, given this authority, that if Moubry incurred expenses in transporting the Plaintiff to school, when a proper IEP would have provided free transportation directly to and from his home, the IDEA would authorize an award of transportation expenses. The Plaintiff, however, failed to document her claimed transportation expenses before the HO, or the HRO. It appears from the Record, although not conclusively so, that the Plaintiff lived approximately four blocks from school, and any expenses, which were attributable to the brief deprivation of transportation—over and above the 20 hours of compensatory education—would have been nominal, at best. See, *Letter from Jalonen to Moubry of 3/6/98, CI* 206. Without any evidence of documented transportation expense having been presented in the administrative hearings below, we must uphold the HRO's decision to deny the request for their reimbursement.

In sum, based upon an independent review of the Record, we agree with the HRO's decision, and conclude that the District is entitled to Judgment on the Record.

**B.** *Motion for Summary Judgment.* The District also moves for Summary Judgment on the various supplemental claims, which are generally based upon the same facts as the IDEA claim.

**1.** *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the non-moving party, and we have found no triable issue. *Lower Brule Sioux Tribe v. State of South Dakota,* 104 F.3d 1017, 1021 (8th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Dodd v. Runyon,* 114 F.3d 726, 729 (8th Cir.1997).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion,

the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.,* supra at 256, 106 S.Ct. 2505; *Ivy v. Kimbrough,* 115 F.3d 550, 551 (8th Cir.1997); *Thomas v. Runyon,* 108 F.3d 957, 959 (8th Cir.1997). Moreover, the movant is entitled to Summary Judgment where the non-moving party has failed "to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra 477 U.S. at 322, 106 S.Ct. 2548; see also, *Greer v. Shoop,* 141 F.3d 824, 826 (8th Cir.1998); *Mayard v. Hopwood,* 105 F.3d 1226, 1228 (8th Cir.1997). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* supra 477 U.S. at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.,* 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross,* 992 F.2d 162, 163 (8th Cir.1993).

Lastly, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence, [Courts] are particularly deferential to the non-moving party alleging discrimination." *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996), citing *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994); see also, *Davis v. Fleming Cos.,* 55 F.3d 1369, 1371 (8th Cir.1995); *Oldham v. West,* 47 F.3d 985, 988 (8th Cir.1995); *Hardin v. Hussmann Corp.,* 45 F.3d 262, 264 (8th Cir. 1995); *Gill v. Reorganized Sch. Dist. R–6,* 32 F.3d 376, 378 (8th Cir.1994). This deference does not, however, obviate the non-moving party's burden to establish a factual dispute on every essential element of his case, and a failure to do so will still result in Summary Judgment. *Snow v. Ridgeview Medical Center,* 128 F.3d 1201, 1205 (8th Cir.1997); *Bia-*

*las v. Greyhound Lines, Inc.,* 59 F.3d 759, 762 (8th Cir.1995).

■ 2. *Legal Analysis.* We begin our analysis of the remaining claims by addressing a paramount threshold consideration. It is now beyond question that an IDEA plaintiff can also assert viable claims against a School District under separate statutes, including the ADA, Rehabilitation Act, MHRA, and the MGDPA. See, *Independent Sch. Dist. No. 283 v. S.D.,* supra at 562; *Digre v. Roseville Schools Ind. Dist. 623,* 841 F.2d 245, 249–50 (8th Cir.1988). While that has not always been the case, see, *Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (Federal civil rights claims preempted by IDEA), Congress has left no doubt as to its intention to allow such claims to proceed in tandem with an IDEA claim. See, *The Handicapped Children's Protection Act of 1986,* Pub.L. No. 99–372 § 3, 110 Stat. 796 (1986). As amended, the IDEA provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, Title V of the Rehabilitation Act of 1973 [20 U.S.C.A. § 790, et seq.], or other Federal statutes protecting the rights of handicapped children and youth, except that before the filing of a civil action under the laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

*Title 20 U.S.C. § 1415(f).*

Our Court of Appeals has held that this Section was designed to reestablish the statutory rights that "were repealed by the U.S. Supreme Court in Smith v. Robinson." *Digre v. Roseville Schools Ind. D. 623,* supra at 250, quoting *Mrs. W. v. Tirozzi,* 832 F.2d 748, 754 (2nd Cir.1987).

■ Notwithstanding a plaintiff's ability to proceed simultaneously with IDEA and other statutory claims, he cannot establish a viable claim under the non-IDEA causes of action, where the predicate acts, upon which he has premised those claims, have withstood

judicial review under the IDEA. *Independent Sch. Dist. No. 283 v. S.D.*, supra at 562. Stated otherwise, "[w]hen [the IDEA] process produces an administrative decision that is upheld on judicial review under IDEA, principles of issue and claim preclusion may properly be applied to short-circuit redundant claims under other laws." *Id.*, citing *University of Tennessee v. Elliott*, supra 478 U.S. at 769–99, 106 S.Ct. 3220, and *Plough v. West Des Moines Comm. Sch. Dist.*, 70 F.3d 512, 515–16 (8th Cir.1995). As a consequence, no viable claim can exist under these other statutory provisions, in the absence of a claim which, factually and legally, is distinct from those that have already been resolved under IDEA review.[11] *Id.*

We reject the Plaintiff's contention that the rule of preclusion, which was adopted in *S.D.*, cannot apply to his other claims. He suggests that, since the discrimination claims were not and could not have been raised before the HO and HRO, and since the HRO's determination was not a final judgment, the elements of *res judicata* have not been satisfied. Nevertheless, *S.D.* also involved an administrative IDEA decision that, once upheld on judicial review, was applied to bar seven additional claims that were not litigated before the administrative agency.[12] *Id.* In short, once the Court upholds the factual findings of the State administrative agency, those findings, which were necessary to the agency's decision, are entitled to preclusive effect.

a. *Americans with Disabilities Act, Rehabilitation Act and Minnesota Human Rights Act Claims.*

The ADA protects disabled individuals from unfair discrimination as follows:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subject to discrimination by such an entity.

*Title 42 U.S.C. § 12132.*

■ In order to prevail on an ADA claim, a plaintiff must show:

1. that he is a qualified individual with a disability;

2. that he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities; and

3. that such treatment was by reason of his disability;

*Hoekstra v. Independent Sch. Dist. No. 283*, 916 F.Supp. 941, 948 (D.Minn.1996), aff'd, 103 F.3d 624 (8th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1852, 137 L.Ed.2d 1054 (1997).

■ More importantly, where the claim is brought in the context of educational services for disabled children, ADA liability does not attach absent a showing of gross misjudgment, or bad faith, on the part of the school officials. *Hoekstra v. Independent Sch. Dist. No. 283*, 103 F.3d 624, 627 (8th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1852, 137 L.Ed.2d 1054 (1997); see also, *Brantley v. Independent Sch. Dist. No. 625*,

---

11. As noted earlier, *Elliott* requires the Federal Courts to give preclusive effect to the factfinding of State administrative tribunals, which have acted in a judicial capacity, and in which the parties have had an adequate opportunity to litigate. In such circumstances, the Court affords the agency's factfinding the same preclusive effects to which it would be entitled in the State's courts. *University of Tennessee v. Elliott*, supra 478 U.S. at 799, 106 S.Ct. 3220. Under Minnesota law, for collateral estoppel to apply to an agency decision, five factors must be met: 1) the issue to be precluded must be identical to the issue raised in the prior agency adjudication; 2) the issue must have been necessary to the agency adjudication and properly before the agency; 3) the agency determination must be a final adjudication subject to judicial review; 4) the estopped party was a party or in privity with a party to the

prior agency determination; and 5) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue. *Peterson v. Independent Sch. Dist. No. 311*, 999 F.Supp. 665, 671 (D.Minn.1998), citing *Falgren v. State Bd. of Teaching*, 545 N.W.2d 901, 905 (Minn.1996) [other citations omitted].

12. We reject the wholly unsubstantiated suggestion of Plaintiff's counsel—who also served as the plaintiffs' counsel in *S.D.*—that the HO who presided over S.D.'s administrative IDEA Hearing agreed to decide issues of discrimination. The Court's Order, in *S.D.*, is devoid of any reference to the administrative findings concerning the plaintiffs' claims of disability discrimination. Further, if the Eighth Circuit considered that factor to be dispositive, it curiously made no mention of it.

936 F.Supp. 649, 654 (D.Minn.1996). There is no distinction between the analysis of a claim under the ADA, and under the MHRA, in the context of educational services for disabled children. See, *Roberts v. KinderCare Learning Centers, Inc.*, 86 F.3d 844, 846 n. 2 (8th Cir.1996) (finding no distinction between ADA and MHRA in analyzing school's alleged failure to accommodate disabled child); cf., *Breiland v. Advance Circuits, Inc.*, 976 F.Supp. 858, 864 (D.Minn.1997) ("claims under the Minnesota Human Rights Act are interpreted consistently with claims under the ADA").

Section 504 of the Rehabilitation Act, *Title 29 U.S.C. § 794*, which is a predecessor of the ADA, has been held, in this context, to impose a standard identical to that of the ADA. See, *Hoekstra v. Independent Sch. Dist., No. 283*, supra at 626. To be more historically accurate, the standard for liability, which requires a showing of "either bad faith or gross misjudgment," arose in the application of the Rehabilitation Act. See, *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir.1982), cert. denied *sub nom, Rose v. Nebraska*, 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983). Thus, to maintain a claim against the School District for a violation of Section 504, the Plaintiff must, again, show "bad faith or gross misjudgment" in the provision of educational services on the part of school officials.

13. The Federal Regulations, at 34 C.F.R. § 104.33(b), require the District to provide "regular or special education that (i)[is] designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met ***."

14. The Federal Regulations also prohibit the District from excluding "any qualified handicapped person from a public elementary *** education ***." *34 C.F.R. § 104.33(d)*.

15. According to the Federal Regulations, see, *34 C.F.R. § 104.34(a)*, the District is required to "conduct an evaluation *** of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in a regular or special education program and any significant change in placement." The Plaintiff also contends that the District's refusal, to inform Moubry of his "placement" until she had actually enrolled him in school, amounted to disability discrimination in violation of the Minnesota Human Rights Act.

The Plaintiff advances the following claims under the Rehabilitation Act:

1. The District did not provide him with special education services that were designed to meet his individual reading needs, but only provided him with Title One services;[13]

2. The District excluded the Plaintiff from a public education, by refusing to state what services would be provided for the Plaintiff, until Moubry enrolled him;[14]

3. The District failed to provide an evaluation, from trained personnel, until four months after the Plaintiff enrolled;[15]

4. The District did not make a placement decision for the Plaintiff based upon documented, carefully considered information that came from a variety of sources[16]

The Plaintiff also advances a series of alleged violations under the ADA and MHRA. In Count III of his Complaint, the Plaintiff claims as follows:

1. The District failed to provide the Plaintiff with services that were effective in affording him an equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as other pupils;[17]

2. The District failed to modify its policies, practices and procedures to avoid discriminating against the Plaintiff on the basis of his disability, by refusing to pro-

16. In making placement decisions for a disabled child, the District was required to:

(1) draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior,

\* \* \* \* \* \*

(3) ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options ***.

*34 C.F.R. § 104.35(c)*.

17. Department of Justice regulations forbid the District from, "on the basis of disability," providing "a qualified individual with a disability" any "aid, benefit, or service" that is less effective "in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others ***." *28 C.F.R. § 35.130(b)(1)(iii)*.

vide the Plaintiff with transportation services;[18]

3. The District imposed eligibility criteria designed to screen out individuals with disabilities from participating in special education;[19]

4. The District denied Moubry's right to participate in its services, on the basis of her parental relationship with a disabled individual, the Plaintiff.[20]

The Plaintiff's MHRA allegations are duplicative of those presented under the Rehabilitation Act and the ADA.

■ The Plaintiff insists that, because the Rehabilitation Act, the ADA, and the MHRA, have imposed different particularized requirements upon the District through the various Federal regulations, our affirmance of the HO and HRO's factual findings have no legally preclusive effect upon such claims. The Plaintiff overlooks the well-settled principle that the *sine qua non* for claims against the District, under all three of these statutory measures, is a finding of bad faith or gross misjudgment on the part of school officials. See, *Hoekstra v. Independent Sch. Dist. No. 283,* supra at 627; *Independent Sch. Dist., No. 283 v. S.D.,* supra at 626. No amount of claimed violations of the Federal regulations will relieve the Plaintiff from his burden to show bad faith or gross misjudgment. Upon a review of the administrative findings in their totality, it would be legally untenable to conclude that, in providing for the Plaintiff's education, in an manner that fully complies with the IDEA, the District officials, nevertheless, acted in bad faith, or with gross misjudgment, without wholly vitiating the results of our Judgment on the Record.

In short, as our discussion of the IDEA claims reflect, the HO and HRO painstakingly documented the District's consistent efforts to ensure that the Plaintiff was provided with services which were appropriate to his needs, and that Moubry was afforded an opportunity to participate in the facilitation of the IEP. The HRO characterized the District's efforts as manifestly in "good faith," see, *Level II Memorandum,* and no errors, that were documented in this Record, could colorably be characterized as exemplifying gross misjudgment.

■ Moubry argues that her personal ADA claim against the District cannot be precluded by the IDEA decision. We disagree. The allegation stated in paragraph 76(d) of the Complaint—the only one pled on Moubry's behalf—is little more than a repackaged IDEA claim. The asserted withholding of services to Moubry, based upon her relationship with a person with a known disability, see, *28 C.F.R. § 35.130(g),* is founded upon the denial of Moubry's "right to equal access and participation to [sic] the ISD 696 and its services ***." *Compl.* ¶ 76(d). Read in context with the specific factual allegations made in the Complaint in its entirety, Moubry contends that the District denied her a right to participate in the formulation of her son's IEP. Having unequivocally ruled in the contrary, under the auspices of the IDEA, we find this claim precluded as well, particularly given Moubry's status as a privy to a party, if not a party herself.[21]

b. *The Claims brought pursuant to Minnesota Education Laws.*

■ In Count IV of the Complaint, the Plaintiff contends that the District violated

---

18. For this allegation, the Plaintiff contends that the District did not adhere to 28 C.F.R. § 35.130(b)(7), which provides, in pertinent part:
 A public entity shall make reasonable accommodations in its policies, practices and procedures when the modifications are necessary to avoid discrimination on the basis of disability ***.

19. The Code of Federal Regulations does not allow public entities to impose, or to apply, eligibility criteria in a manner that screens out, or that tends to screen out, "an individual with a disability" from fully and equally enjoying any service, program or activity. *28 C.F.R. § 35.130(b)(8).*

20. This claim, Moubry asserts in her own right, under a regulation that prohibits public entities from excluding from equal services, programs, or activities, any individual because of her relationship with a person with a known disability. See, *28 C.F.R. § 35.130(g).*

21. In the Plaintiffs' Memorandum of Law, it is asserted that the District discriminated against Moubry on the basis of *her* disability. This claim was not plead in the Complaint and, therefore, is not properly before the Court. Moreover, we have no idea what disability Moubry claims as her own for that, too, has not been pled, nor has it otherwise been shown in this Record.

Minnesota Statutes Section 120.17, Subdivision 3a(1) and (3), and Section 120.185. These laws closely mirror the provisions of the IDEA. Section 120.17, Subdivision 3a(1), requires the District to provide an IEP for disabled students, while Subdivision 3a(3) requires the District to impose procedural safeguards in the IEP process, including the parent's "right to participate in decisions involving identification, assessment * * * and educational placement of children with a disability." For its part, Section 120.185 mirrors Section 504 of the Rehabilitation Act, and requires the District to make "reasonable accommodations or modifications of programs," for disabled school children.

As we have explained previously, while a State is free to exceed the Federal floor of protection afforded to disabled children by the IDEA, and some States have elected to do so, "Minnesota is not one of them." *Independent Sch. Dist. No. 283 v. S.D.*, supra at 884, citing *Schuldt v. Mankato Independent Sch. Dist. No. 77*, 937 F.2d 1357, 1361 (8th Cir.1991) and *Bowman Independent Sch. Dist. No. 241*, Case No. 50–2103–6686–3 (Minn.Dept.Educ., Oct. 16, 1992). Count IV, which is entirely predicated upon State laws that regulate the formulation of the IEP, is the quintessential sort of "redundant claim," which should be "short-circuited" through claim preclusion. See, *Independent Sch. Dist. No. 283 v. S.D.*, supra at 562. Summary Judgment on this Count, therefore, is appropriate.

■ c. *Minnesota Government Data Practices Act*. In Count V, the Plaintiff contends that the District failed to timely respond to a request, on March 31, 1996, for educational data about the Plaintiff's speech therapy progress. *Compl.* ¶ 79. The School District, it is alleged, did not respond until April 17, 1996—stating that such data did not exist. The Plaintiff claims that the delay

injured him by causing "his inability to respond to allegations about such services during the pendency of the due process hearing and before school concluded for the summer."

Minnesota Statutes Section 13.04, Subdivision 4, requires public schools to provide educational data about students within five days of a parent's request. The Plaintiff seeks costs, and attorneys fees, to remedy this violation, in accordance with the following provision:

> [A] *** state agency which violates any provision of this chapter is liable to a person *** *who suffers any damage as a result of the violation*, and the person damaged *** *may bring an action* against the *** state agency *to cover any damages sustained*, plus costs and reasonable attorney fees.

*Minnesota Statutes Section 13.08* [emphasis added].

Even if the District had delayed too long in informing Moubry that the phonetic inventory records did not exist, the Plaintiff has not incurred any resulting damages. The Plaintiff argues that he need not establish the amount of damages suffered, because the precise measure of damages is to be resolved by a finder of fact. Nevertheless, at a minimum, the Plaintiff must establish that he has suffered some injury-in-fact, as a result of the alleged MGDPA violation. Cf., *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (injury must be "concrete and particularized"). We do not sit to decide hypothetical questions about the MGDPA, or any other law, which does not concretely affect the rights of the litigants. The Plaintiff has not demonstrated an issue of material fact—namely, that he has suffered any injury because of the District's short delay in informing him that the requested material was unavailable—and, therefore, the factfinder would have nothing to decide.[22] As a consequence, his MGDPA claim is dismissed.

---

**22.** We wish to make clear that a short delay in advising that the requested information does not exist could, conceivably, produce a monetary loss. Here, however, there is no showing that the delay in the provision of the requested information produced any actual loss and, conceptually, it is logically implausible that such a loss

occurred. The Plaintiff argues that the information was to be used in the context of the administrative proceedings but, if no such information existed, we cannot understand how the Plaintiff was prejudiced by the short delay, much less how he could have been monetarily damaged by that delay.

### IV. Conclusion

We come full circle for, in the context of the Motion for a Preliminary Injunction, we encouraged the parties to maintain a focus on the most critical aspect of these proceedings—the education of the Plaintiff. While we understand that such proceedings can be emotionally infused—to the point of educational distraction—we again implore all concerned to concentrate, most closely, on the educational opportunities available to the Plaintiff, in order to reasonably assure his progress through the provision of FAPE, consistent with an IEP that bears the informed contributions of the educators, the Plaintiff, and of the Plaintiff's mother. While the IDEA has an inherent proclivity toward an adversarial approach, nevertheless, with the cooperative efforts of all concerned, the hallmark of the IDEA approach—namely, a collaborative process by parents and educators alike, so as to assure an instructional advancement greater than the sum of the individualized contributions—can be achieved toward the Plaintiff's best, and necessarily continuing, educational interests. We, again, commend that approach here.

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendant's Motion for Judgment on the Record [Docket Nos. 30 and 38] is GRANTED.

2. That the Defendant's Motion for Summary Judgment [Docket No. 34] is GRANTED.